Helen Knight and Raymond Willis, Jr., Plaintiffs-Appellees, v. William U. Bardwell, as Executor Under the Will and Codicils of Maud M. Bayless, Deceased, and Christian Science Pleasant View Home of Concord, New Hampshire, a Corporate Body, Defendants. Christian Science Pleasant View Home of Concord, New Hampshire, a Corporate Body, Defendant-Appellant.

Gen. No. 48,544.

First District, First Division.

December 31, 1963.

Rehearing denied January 29, 1964.

Robert E. Cook and William C. Wines, of Chicago (William C. Wines, of counsel), for defendant-appellant, Christian Science Pleasant View Home of Concord, New Hampshire.

Albert E. Jenner, Jr., Addis E. Hull III, and Robert E. Pfaff, all of Chicago (Thompson, Raymond, Mayer & Jenner, of counsel), for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Plaintiffs, step-grandchildren of the testator, Maud M. Bayless, were designated as beneficiaries to receive 150 shares each of Texaco stock under her will and codicil thereto. They filed a construction suit to determine the proper distribution of 900 additional

shares which had resulted from two stock splits before testator's death, one having occurred after the execution of the will and the other after the codicil.

From a decree awarding all the shares to the grandchildren, an appeal has been taken by the residuary legatee, the Christian Science Pleasant View Home of Concord, New Hampshire, a charitable corporation.* The grandchildren have cross-appealed from an order denying their petition for allowance of attorneys' fees and costs. There is no dispute as to the facts. They appear from undenied pleadings and from a voluminous stipulation of facts filed in the trial court.

The principal issue is whether an intention to include the shares resulting from either or both splits in the bequests to the grandchildren is evidenced by the testamentary instruments themselves, or in the context of surrounding circumstances.

Testator was the third wife of Benjamin Bayless, from whom she received 100 shares of Texaco stock as a gift some time before his death in 1920. By that time the number of these shares had been increased to 400 by virtue of a split in 1919.

As a result of trading on the market and receiving stock dividends, testator's ownership of Texaco stock varied over the years. At the time of executing her will in 1950, she owned 1,040 shares. Thereafter in 1951, there was a two-for-one split, and thus, at the date of the first codicil in 1952, she held 2,100 shares. At the time of another two-for-one split in 1956, the testator owned 2,000 shares and continued to hold the resulting 4,000 shares until her death later that year at the age of 91.

---

* We shall refer to the parties in this court as "the grandchildren" and "the Home." The executor was also a defendant in the trial court, but has not participated in this appeal, taking a position of neutrality between the parties here.

Of the 16 testamentary instruments executed by Mrs. Bayless or drawn at her request but not executed, only four were admitted to probate:

(1) Testator's last will, executed on July 14, 1950, included a bequest of 300 shares of Texaco stock in these words:

> Whereas, I have in my safety deposit box in the First National Bank and Trust Company of Evanston, Illinois, among other securities, three hundred (300) shares of the Texas Corporation, which securities came to me from my husband, Benjamin Bayless, and which, other than the Greenwood Inn situated in Evanston, Illinois, comprised a considerable portion of the liquid estate at the time of his death and which, at the present time (July, 1950) are worth approximately $20,000; and
>
> Whereas, the will of my husband, Benjamin Bayless, was set aside as a result of action taken by his son, George Wood Bayless, and his wife, and a new contract was made whereby I have heretofore released to said George Wood Bayless, at his request, all my right, title and interest in and to said Greenwood Inn, except such as according to the contract and also by the original will of my husband, I have by way of annuity; and
>
> Whereas, my deceased husband's granddaughter, Wilhelmina C. Bayless, his only other heir, since deceased without issue, was amply provided for by the terms of his will and by the terms of a subsequent contract relating thereto;
>
> Therefore, without any obligation on my part but because of my desire to do as I would wish to be done by, I hereby give, devise and bequeath

335

unto Wilhelmina B. Willis,* daughter of my said deceased husband, the three hundred (300) shares of said Texas Corporation. In case the said Wilhelmina B. Willis should die before my death, then I give, devise and bequeath the said shares of stock to such of her two children as may survive me, share and share alike. Certificates for said three hundred (300) shares will be found in an envelope, properly marked, in said safe deposit box.

The residue was left to the Home for the purpose of "increasing the facilities for the care of aged professional or worthy non-professional workers in the cause of Christian Science."

(2) Following the death of their mother, the plaintiffs were mentioned by name in testator's first codicil which was executed on May 1, 1952, and contained the following language relating to their bequest:

In the second provision of my Will I bequeathed three hundred shares of the capital stock of the Texas Corporation unto Wilhelmina B. Willis, the daughter of my deceased husband, Benjamin Bayless, or, in case of her prior decease, to such of her children as might survive me and related my reasons for such legacy. The said Wilhelmina B. Willis is deceased and left her surviving Helen Knight, her daughter and Raymond Willis, Jr., her son. My attitude toward the two grandchildren of my deceased husband has not changed since I signed my Will July 14, 1950, and out of love for my husband I give one hundred and fifty shares of the capital stock of the Texas Corporation as constituted when my will and codicil become effective unto said Helen Knight and an

_____
* Mother of the plaintiffs.

equal number of said shares of the Texas Corporation stock unto said Raymond Willis, Jr.

To the language of the will giving $5,000 to the First Church of Christ, Scientist, of Evanston, Illinois for the "wise and rightful expansion, in Evanston or elsewhere, of the cause of Christian Science, as taught by Mary Baker Eddy" was added the phrase, "by which I have lived and been blessed for fifty years."

(3) The second codicil of October 22, 1952, directed that taxes be paid out of the residue.

(4) The third codicil of February 4, 1956, added an in terrorem clause which will be considered later in this opinion.

Considered by itself, a bequest of shares of stock made without reference to future stock dividends or splits will always, in the event of such eventuality, produce an ambiguity. By the very nature of such a bequest there is nothing to indicate whether it could be satisfied by distribution of the precise number of shares mentioned or whether fulfillment of the bequest would require further distribution of whatever additional shares might have been issued by way of dividend or split with respect to the original stock.

When presented with this problem, the court must, therefore, seek to ascertain the intention of the testator from the whole of the testamentary documents admitted to probate, and if this search, in turn, is fruitless, then those documents must be considered further in relation to the surrounding circumstances.

Necessary in the determination of testator's intent as expressed in her will and codicils is a recognition of what a share of stock represents to an investor. A certificate for shares of stock is merely evidence of the shareholder's proportionate ownership interest in a corporation. Besides representing a claim to a certain fraction of profits declared as dividends, the

shares entitle the holder to his portion of corporate assets upon dissolution. Thus, a stock split changes only the evidence of the shareholder's proportionate interest, and results in his owning more shares representing the same interest in the corporation. In consequence, through a two-for-one split, for example, the market value or price per share would ordinarily be cut in half, but the value of the shareholder's interest would remain the same.

The Home considers the words of the first codicil "one hundred and fifty shares of the capital stock of the Texas Corporation as constituted when my will and codicil become effective" as a clear expression by the testator of an intent to bequeath 150 shares as of the date of her death. With just as much reason, this language could be considered a bequest of 150 shares as they existed at the date of execution of the codicil, together with whatever stock dividends might accrue to the date of her death, so that the 150 shares as constituted at the date of death might well mean more than 150 shares as of that date. Or the language might mean, as found by the court, that the words "as constituted when my will and codicil become effective" modified the corporate name rather than the shares or the number of shares. Our conclusion is that it does not settle the matter of the testator's intent but leaves it ambiguous for determination on the basis of other considerations.

The Home argues that testator's failure to increase the stated number of shares of the will after one split had taken place, when she had an opportunity to do so in the first codicil, indicates that she meant to ratify the reduction in market value of the bequest which took place because of the lowered per-share value resulting at the time of the split.* This argument must

---

* The first stock split (after the will, but before the codicil) resulted in a reduction of market price from $92 to $46 per share.

first overcome the hurdle of awareness of the split on the part of the testator, for if she were unaware of it, she could hardly have intended to use its result. But even if awareness were proven, as seems to be the case here, it does not necessarily demonstrate an intent that the split should reduce the bequest. There is uncertainty in predicting what action would be taken by a testator because of such awareness, and that very uncertainty has previously led this court to discount the value of awareness as determinative of intent. We said in Heckler v. Young, 264 Ill App 34, 42:

> Defendants argue strongly that at the time the will was signed the testatrix knew that the proposed exchange of stock was in the process of being effected, and that from this date, May 6, to the following August when she died, she made no attempt to change the wording of this bequest. On the other hand, it is reasonable to suppose that the testatrix had in mind that she had definitely described the shares which she intended complainant to have and assumed that these shares, after the increase in the whole number of shares, would pass to complainant in their changed form of 3 for 1. A similar situation was involved in Fidelity Title & Trust Co. v. Young, 101 Conn 359, where the court said, "As to the argument derived from the testator's failure to change his will after the par value of the stock was reduced, it is enough to say that if we have correctly interpreted testator's original intent, he might well suppose that there was no occasion to make any change."

There are other facts which have a bearing on our determination of the effect of the second stock split

---

With the second split the market price dropped from $126 to $63 per share.

occurring in the year of death, although they are not applicable to the split before the codicil. These relate to a testator's natural inertia and inclination to procrastinate, and, when added to the point we have just been discussing, show further the speculative nature of a determination of intent on the basis of a failure to change the stated number of shares.

The degree of personal interest in the parties is an indication of possible intent to favor one or another. How did testator regard her grandchildren? The preamble to their bequest in the will states: "Without any obligation on my part but because of my desire to do as I would wish to be done by, I hereby give . . . ." This is not a usual expression of love or appreciation of kindnesses, but it does not necessarily disfavor the grandchildren who find comfort in her reference to the golden rule.

In the first codicil, the testator states that her attitude toward the grandchildren had not changed since she signed her will and that the gift was made "out of love" for her husband. This might indicate that she had no desire to cut down on the value of the gift.

The grandchildren point out that the testator expressed in her will her intention to return to her deceased husband's side of the family those shares of Texaco stock which "came to me from my husband, Benjamin Bayless, and which, other than the Greenwood Inn situated in Evanston, Illinois, comprised a considerable portion of the liquid estate at the time of his death." She evidently wanted to return the major part of this property to his family. This might support the argument that she intended to include the split shares.

The testator's attitude toward the Home is apparent from her high regard for the Christian Science faith, which she described in the first codicil as a cause

"by which I have lived and been blessed for fifty years." The testator also showed her concern for the purposes of the Home by providing for alternative Christian Science Homes in case Pleasant View should be unable to accept her legacy to it.

The Home discerns a tendency to limit the gift to the grandchildren and to augment the Home's legacy in the change from 300 shares, share and share alike, in the will, to the 150 shares each, in the codicil, because in the event that only one of the plaintiffs survived the testator, the will would give that plaintiff the whole 300 shares, while under the codicil the surviving plaintiff would take only 150 shares. However, the change is also compatible with an intention primarily to acknowledge the death of plaintiffs' mother after execution of the will, as indeed the codicil states, and then to direct that the previous gift to the mother should be divided equally between the plaintiffs.

In support of the view, moreover, that testator did not wish to increase the legacy to the Home at the expense of members of her family and friends is the addition in the first codicil of gifts of $1,000 each to five of her friends.

A final argument by the Home on the testamentary instruments is that the omission in the codicil of the value of the shares which had been stated in the will reveals an intention not to give the original shares or their equivalent, but to give 150 shares referring only to the new issue. It is not customary, however, in bequeathing stock to state its current market value, and as we perceive the factual basis for this contention it is one which could point either way.

In seeking, as we have been and should be, to glean the intention of the testator from her own testamentary language relating specifically to the property in dispute, and from her will and codicils taken as a whole (Allen v. National Bank of Austin, 19 Ill App2d 149,

153, 153 NE2d 260), we have found ourselves led back and forth from one conclusion to the other with the result that we have decided that the testamentary documents themselves are not determinative of the testator's interest in this regard. We shall turn, therefore, to a consideration of the extrinsic evidence in an effort to resolve the ambiguity. Weir v. Leafgreen, 26 Ill2d 406, 186 NE2d 293.

The stipulation of facts includes 14 wills or drafts of wills prepared by or on behalf of the testator between 1935 and 1950, the date of her last will.

In the first of these, the testator recited that 400 shares of stock of Texaco had come to her from her husband and comprised approximately all of his estate at the time of her marriage to him, excluding his interest in the Greenwood Inn. The testator bequeathed those 400 shares to plaintiffs' mother, or if she should predecease the testator, then to plaintiffs' mother's heirs.

Throughout all the extrinsic documents, the testator evidenced her intent to return to her husband's side of the family all or a considerable portion of the shares of Texaco stock which she had received from her husband during his lifetime. While the testator held different numbers of shares of Texaco stock over the years, as a result of trading on the market and receiving stock dividends, at no time did she hold less than the equivalent equity of stock given to her by her husband. However, the fact that testator did not give back all the shares indicates that the sanctity of the return of her gift was not inviolate. From a bequest of 400 shares, the amount was reduced to 300. One draft considered 350 shares. In these circumstances the Home uses the reduction from 400 to 300 shares to argue that there was a trend to diminish the gift to the grandchildren, so that a denial of the split shares would merely be a continuation of this pattern.

We also learn from extrinsic evidence that, although the testator had sent Christmas cards and college graduation gifts to the grandchildren, she had not seen, talked to, or corresponded with them for about thirty years before her death. This substantiates the impression gained from the will that she did not have a close personal interest in her husband's grandchildren.

In addition to her attitude toward the various beneficiaries, the extrinsic evidence may be said to throw some light on her attitude toward the subject matter of the bequest. If Mrs. Bayless was not an investor who considered stock as a proportionate interest in a corporation, but only as an approximate sum of money, the codicil could represent a reduction of the bequest. Since the market value of the stock nearly doubled from the date of the will to that of the codicil, she may have intended to give only half of the post-split shares in order to keep the gift at approximately the same cash value.* Moreover, a letter written by the testator in the month preceding the codicil did state that the gift should be changed to a cash amount, $12,000.** However, since this change was not effectuated, the reason may have been rejected, and as evidence of testator's intent it remains sheer speculation. Shares, not cash, were ultimately bequeathed.

The Home argues that the destruction of the envelope to which the testator had referred in her will as containing the certificates for 300 shares in a safety

---

* On July 14, 1950, 300 shares of Texaco stock were worth approximately $19,050. The 600 shares into which they were split were worth approximately $32,600 on May 1, 1952.

** Letter to Mr. Bardwell, her executor, on April 12, 1952, stated in part: "The '300 shares of Texas,'—must be changed to '$12,000' as a bequest to 'Wilhelmina Willis or her heirs,'—now that she is gone,—and perhaps the balance of the wording must also be changed."

343

deposit box, and the omission in the codicil of a designation of the whereabouts of the specific shares that were to be the subject of the gift is a further indication that she had abandoned her plan to give the particular shares received from her husband, and evidenced her intent to give only 150 each, no matter what the value at the time of her death or what proportionate interest they represented. We feel that this is stretching a negative inference, especially in view of the fact that the envelope had been destroyed in 1956 at the time the shares, together with the testator's other securities, were transferred to a trust for her life.

Considering the extrinsic evidence along with the testamentary documents, we still feel that we are left without a basis for decision as to the testator's intentions, and in the absence of determinative expression of intent, we shall assume that the testator intended to give the shares resulting from the split and the pre-split, or basic shares to the same beneficiary. This conclusion, we believe, accords with the holdings in the only two Illinois cases on the subject. In Allen v. National Bank of Austin, 19 Ill App2d 149, 160, 153 NE2d 260, the court made this pronouncement:

> We hold that in the absence of an intention to the contrary, a legatee of shares of stock is entitled to additional shares issued as a result of a stock split occurring after execution of the will.

The opinion in the earlier case of Heckler v. Young, 264 Ill App 34, 43 (1931) had also concluded:

> It is more rational to believe, in view of all the circumstances we have referred to, that the intention was to give to complainant 30 shares of old stock or its equivalent in new stock . . . .

The most recent opinion on the subject, however, handed down by a court worthy of the greatest re-

spect, has utilized a principle opposite in effect. In McGuinness v. Bates, 189 NE2d 212 (Mass, 1963) American Telephone & Telegraph shares which were the subject of a testamentary gift, were split 3 to 1 after execution of the will and before the death of the testator. The court made a distinction between general and specific legacies, and affirmed the trial court's ruling that the bequest was a general one and that the additional shares, the product of the split, therefore, fell within the residue.

The reasoning behind this result and its inapplicability to Illinois law is understandable only in light of the dilemma inherited from the common law. The rules by which the Massachusetts court felt itself bound can be briefly stated. A specific legacy but not a general one, included increments after execution of a will and before death of the testator. A presumption existed that a legacy was general. Courts were constrained to deny split shares to a legatee of basic shares unless they could find evidence of a contrary intent.

The distinction between specific and general legacies arose in order to deal with the problems of ademption, where the subject matter of the bequest was no longer in existence or owned by the testator at the time of his death, and the problem of abatement, where the assets were insufficient to satisfy all bequests.

In Partridge v. Partridge, Cas T Tal 227, 25 Eng Rep 749 (c 1736), it was declared that if a bequest were described in general terms, even though the testator disposed of the subject matter during his lifetime, the personal representative was required to obtain and deliver property to the legatee which would satisfy the general description of the bequest. In the subsequent leading case of Ashburner v. MacGuire, 2 Bro Rep 107, 29 Eng Rep 62 (c 1786), involving the sale of East-India stock before the death of the testa-

tor, it was held that the gift of the stock was specific and not general, and that the gift must therefore fail, having been adeemed.

As a sequel to this rule the strong feeling that a testator would want his gift to be effective led to the presumption that a legacy was general. See Robinson v. Addison, 2 Beav 515, 48 Eng Rep 1281 (c 1840). An additional function of this presumption was that it maintained relative equality among beneficiaries, if abatement were necessary. See Simmons v. Vallance, 4 Bro c 345, 29 Eng Rep 927 (c 1793).

Although this presumption in favor of a general bequest proved itself satisfactory in the situations of ademption and abatement, the rule went awry when later applied to stock splits, because of the development of the judicial view that a general legacy of stock could not include shares received from a split. The rationale leading to this result is not immediately apparent, though it seems to stem from the English Wills Act of 1837, section 24:

> Every will shall be construed, with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will.

The purpose of this statute at the time of its enactment was to eliminate the need for republication so that property acquired after execution which came within the description of a devise or bequest would pass by the will. Goodlad v. Burnett, 1 K & J 341, 69 Eng Rep 489 (1855). The courts, however, extracted what we believe was an unnecessary principle that a will must be construed as referring to the personal estate as it existed at time of death. Thus, a designated number of shares was considered to refer only to

post-split shares. In re Gillins, [1909] 1 c 345. In order to avoid denying the additional shares to the legatee of the basic shares, courts then found that a specific legacy was evidence of the "contrary intention" provided for in the Wills Act. In re Clifford, [1912] 1 c 29. The will was thus construed with reference to the shares held at execution and the legatee took them in their new form. Only a specific legacy would, therefore, preclude the operation of the statute. Fidelity Title & Trust Co. v. Young, 101 Conn 359, 125 Atl 871 (1924); First Nat. Bank of Boston v. Charlton, 281 Mass 72, 183 NE 250 (1932); Davis v. Price, 189 Tenn 555, 226 SW2d 290 (1950).

 Illinois has never enacted a statute analogous to the English Wills Act, and so, the Illinois courts, unhampered by such legislation, have proclaimed the principle that a will is not operative until the death of the testator, but it will be interpreted as speaking his intentions as at the time of its execution. Lydick v. Tate, 380 Ill 616, 44 NE2d 583; Heckler v. Young, 264 Ill App 34. Thus, the historical reason for limiting an inclusion of shares to only a specific legacy is not operative. Allen v. National Bank of Austin, 19 Ill App2d 149, 153 NE2d 260.

 Moreover, since 1950, five jurisdictions, including Illinois, have recognized that the rules of construction were inappropriately applied to stock splits, by obliterating the distinction between general and specific legacies as to splits or by expressly rejecting the classification approach. See In re McFerren's Estate, 365 Pa 490, 76 A2d 759 (1950); * In re Fitch's Will, 118 NYS2d 234 (App Div 1952); In re Parker's Estate, 110 So2d 498 (Fla App), cert denied 114 So2d 3 (Fla 1959); In re Helfman's Estate, 14 Cal Rptr 482 (1961); and Allen v. National Bank of Austin, 19 Ill

---

* It is interesting to note that the Pennsylvania court reached this conclusion despite a statute similar to the English Wills Act.

App2d 149, 156, 153 NE2d 260, in which the court stated that "the rationale behind the classification of legacies is not pertinent for our purposes." These cases set forth a new rule of interpretation which we consider a highly salutory one, and applicable to the case before us. It declares that in the absence of a clear expression of intent to the contrary, a beneficiary of shares of stock is entitled to additional shares resulting from stock splits occurring after execution of the will.

We, therefore, conclude that the trial court properly decreed that the grandchildren were entitled to a total of 1200 shares of Texaco stock, together with post-date-of-death cash and stock dividends thereon.

■ A further contention by the Home is that an in terrorem clause added by the third codicil is invoked by the institution of this suit with the result that the grandchildren should be held to have forfeited all but five dollars of their bequests. The clause reads as follows:

> I direct that should any one or more of the beneficiaries, legatees or devisees named in this my Last Will and Testament directly or indirectly contest the validity of this Will, or object to the distribution, legacies or devises as made, or attempt to defeat any of the provisions of this Will, such person or persons shall receive the sum of FIVE DOLLARS ($5.00) each and no more, and any and all other provisions made herein for such contestant or contestants other than the sum of FIVE DOLLARS ($5.00) stated shall be void and of no effect and such bequests, legacies and devises shall fall within and be controlled by the residuary clause of this my Last Will and Testament.

348

The chancellor decreed that no forfeiture resulted. We agree. The suit was obviously not brought to contest the validity of the will. Nor was it brought to defeat any of the provisions of the will or to object to the distribution provided therein. It was brought only for the purpose of ascertaining what distribution was intended by the testator with implicit acquiescence in the carrying out of such distribution as the court might find was intended.

█ The grandchildren have cross-appealed from that part of the order which denied their petition for allowance of attorneys' fees and costs. The other parties had filed similar petitions. At issue was not the reasonableness of the fees but the fund to be charged, the grandchildren contending that the fees should be paid from the residuary estate and the Home arguing that they should be awarded from the fund in dispute, i. e., the shares passing to the grandchildren. We hold that the chancellor did not abuse his discretion in denying the petitions by all parties for allowance of attorneys' fees and costs and recommending that the Probate Court order payment to the executor of his attorneys' fees. Hockersmith v. Cox, 407 Ill 321, 95 NE2d 464.

Affirmed.

MURPHY and BURMAN, JJ., concur.